**TOWN OF WHEATLAND, PLATTE COUNTY, Wyoming, a Municipal Corporation, Appellant, (Plaintiff below),**

v.

**Harold ALLISON and Phyllis Allison, Appellees (Defendants below).**

No. 4824.

Supreme Court of Wyoming.

April 25, 1978.

Frank J. Jones, Wheatland, for appellant.

W. H. Vines, of Jones, Jones, Vines & Hunkins, Wheatland, for appellees.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice.

This appeal questions the obligation of a subdivision developer to pay for fire hydrants and gate valves installed in a residential subdivision of the Town of Wheatland. The Town of Wheatland—based on circumstances more fully explained in this opinion—filed an action against appellees in replevin, seeking a return of these items, or, in the alternative, for recovery of their purchase price. The Town subsequently dismissed the replevin action, but sought a summary judgment for damages based on the affidavit of James R. Dunham and the depositions of Charles Sorrells and appellee, Harold Allison. Appellees responded by moving, pursuant to Rule 12(c), W.R.C.P., for a judgment on the pleadings. Appellees' motion was treated as one for summary judgment under Rule 56, W.R.C.P., with the result that the Town's complaint was dismissed. The Town of Wheatland appeals, contending that, at a minimum, it was entitled to a trial of the issues, but, in the alternative, appellant asks that this court direct the trial court to enter summary judgment in its behalf.

Finding that appellees have a contractual obligation to pay for the items in question, pursuant to a development ordinance of the Town of Wheatland and that there is no issue of material fact which needs to be tried, we will reverse the judgment below and direct the entry of a summary judgment in favor of the Town of Wheatland.

Appellees are owners of certain land, consisting of thirty-seven lots, within the town limits of Wheatland, known as the Allison Addition, which they are developing, or have developed, as a residential subdivision.

During December, 1975, appellee Harold Allison had occasion to discuss the installation of the subdivision water system with Nels Patterson, who was the supervisor of the Town's Water and Sewer Department, Charles Sorrells, Superintendent of Public Works, and Harold Steeley, the Town Building Inspector. The depositions of Sorrells and Allison disclose some disagreement as to what was said in that discussion. Sorrells stated that Allison requested the Town to order the hydrants and valves since it had accounts with the relevant suppliers. Sorrells further represented that he had told Patterson, during this discussion, that he thought such matters were the developer's responsibility, but, nevertheless, directed Patterson to order the hydrants.

Allison testified, in his deposition, that Sorrells and Patterson had indicated that the Town would furnish the hydrants and that they went through the Town ordinance to pick out the proper type of hydrants. In early January, 1976, Allison had another discussion with Sorrells and Steeley regarding the hydrants, at which time it was discovered that Patterson had not yet ordered the hydrants and valves. According to Allison, Sorrells then said he would order the hydrants and "then we can see who's going to pay for them." According to Sorrells, there was a discussion of payment at this meeting, with Allison stating: "Well, if we get the fire hydrants in, we'll see who pays for them." Five hydrants and gate valves were ordered, based on Steeley's decision concerning the number needed for the addition. It was later determined that only four were required—there having already been one hydrant installed in the addition—and these were then delivered to and installed by Allison. Allison paid the

hydrant-installation costs, as well as all other construction costs connected with the addition's water and sewer system. In March, Allison was billed for the hydrants and valves, but he refused to pay. During all relevant times, there was in effect Ordinance No. 388 of the Town of Wheatland, which was denominated a "Comprehensive Development Code." The terms of this Code will be set forth in our discussion of the salient issues.

Appellant seeks reversal and a direction of judgment in its favor on the basis of one contention, which can be summarized as follows: That Ordinance # 388 of the Town of Wheatland, in existence at the time, required Appellees to furnish and install fire hydrants upon property that was being subdivided. Given the state of the evidence, it is not appellant's contention that there was an oral agreement with the Allisons to the effect that they would pay for the hydrants and valves. On this issue, we tend to agree with appellee's conclusion that there is no evidence which shows the mutual assent necessary for enforcement of such an agreement; nor do we find sufficient circumstances from which mutual assent may fairly be inferred. See, *Kelsey v. Anderson*, Wyo., 421 P.2d 163, 164; and 17 Am.Jur.2d, Contracts, § 4. An obligation must arise, if at all, from the language of the town ordinance.

> One of the purposes for the ordinance is ". . . to facilitate adequate provisions for community utilities such as transportation, water, sewage, schools, parks and other public requirements; . . ."

The primary means selected to carry out this and other purposes indicated in the ordinance is a system which consists of plat-processing and the issuing of construction permits. The authority for such a system, and the establishment of regulations pertaining thereto, is provided by statute. § 15–1–610, W.S.1977.[1] We are here con-

---

1. **Section 15–1–610, W.S.1977 [§ 15.1–80, W.S. 1957, C.1965], provides:**

   "When subdivision plats must be approved by planning commission and governing body before recording; adoption of regulations governing subdivisions.

   "When the planning commission of any municipality has adopted a major street plan

cerned with an interpretation of regulations, pertaining to physical and engineering design standards, contained within the authorized ordinance.[2] The relevant provisions are as follows:

"III.  ADMINISTRATIVE PROVISIONS

\*   \*   \*   \*   \*   \*

"N.  ADMINISTRATION OF PHYSICAL DEVELOPMENT STANDARDS.

"1.  General:

Physical Development Standards are broken into two distinct categories:

– General Construction Specifications
– Codes

Items covered by Section VIII, 'Engineering Design Standards' and Section IX. A., 'General Development Standards' shall be administered by the Town Engineer.

Codes adopted in Section IX, 'Physical Development Standards' shall be administered by the Town Building Inspector/s.

"2.  Exact Procedure:

a.  All general construction shall be in conformity with the general construction specifications and engineering design standards.

b.  *The developer shall be responsible for engineering and materials testing and construction.* Engineering and materials testing shall be done by an engineer/s licensed in the State. [Emphasis supplied]

c.  Periodic inspections shall be made on public construction by the Town Engineer to insure correctness and quality control. Inspections shall be made at the following times:

– Immediately after construction stakeout
– Immediately after initial grading work
– Immediately prior to concrete and paving work

– Prior to backfill of and underground conduits
– Prior to final paving

d.  Inspections for Code compliance shall be performed as specified by the individual code."

"VIII.  ENGINEERING DESIGN STANDARDS

\*   \*   \*   \*   \*   \*

"B.  WATER DISTRIBUTION SYSTEMS

"1.  General Requirements

The water distribution system for any subdivision or addition to the Town shall be designed in conformance to the detailed criteria set forth in this section.

To assure continuity of the present Town system, owners of areas platting within one (1) mile of the Town boundaries shall negotiate written agreements as to the timing, design and construction of water supply and distribution facilities prior to the Mayor's signature being signed on any plats within such one (1) mile area. Said agreements may also call for the time of annexation of said parcels.

Water distribution facilities coming within the scope of these regulations shall be constructed only after a permit for construction has been issued by the Town. The permit will not be issued until after plans and specifications covering the proposed construction have been submitted to the Town and approved by the Town Engineer.

In general, the water distribution system shall be designed so that it is capable of furnishing the required design flow which includes maximum business and residential demand and fire flows simultaneously.

The design of any particular water distribution system serving any subdivision or addition shall conform to the long-range water distribution system plan adopted by the Town. Features of the long range plan shall be incorporated into the design of the particular addition

and has certified it to the governing body, no plat of a subdivision of land lying within the municipality may be filed or recorded in the office of the county clerk until it has been submitted to and approved by the planning commission and governing body, and their approval entered in writing on the plat by the secretary of the planning commission and clerk of the governing body, or other designated members or employees. No county clerk may file or record a plat of a subdivision without such approval, and the filing or recording of a plat of a subdivision without such approval is void. *In exercising the powers granted to it, the planning commis-*

*sion shall prepare regulations governing the subdivision of land within the municipality.* A public hearing thereon shall be held by the governing body, after which it may adopt the regulations for the municipality." [Emphasis supplied]

2.  In making this interpretation, we note that Section I. D., of the ordinance provides:

"In interpreting and applying the provisions of this ordinance, they shall be held to be the minimum requirements for the promotion of the public health, safety, convenience, comfort, prosperity or general welfare."

or subdivision. *In the case of unusually large sizes required by the long range plan,* the Town shall pay its proportionate share. [Emphasis supplied]

\* \* \* \* \* \* .

"3. Design Requirements:

\* \* \* \* \* \*

c. Fire Hydrants:

In accordance with the recommendations of the appropriate bureau, fire hydrants shall be located so that each hydrant will serve an area of not more than one hundred twenty thousand (120,000) square feet, requiring a maximum hydrant spacing of three hundred ninety (390) feet. In addition, a fire hydrant shall be located at each street intersection with the intermediate hydrants along each street being approximately evenly spaced. Additional hydrants may be required where access to other hydrants needed in fighting a fire at a specific location may be blocked or excessive lengths of hose lines required.

Hydrants shall be installed at the exact location back of the street curb as designated by the Town Engineer. Intermediate hydrants along a street shall be located on the extension of lot lines.

\* \* \* \* \* \*

"4. Materials

\* \* \* \* \* \*

All fire hydrants shall be the Mueller A–24015 AWWA improved type with a six (6) inch flanged inlet with two two and one-half inch hoze nozzles, one four inch pumper nozzle, a five and one-quarter inch main valve, national standard hose threads and standard pentagon operating nut or equal. Hydrants shall be designed for a pipe depth of five feet (to top of pipe). Each hydrant shall be installed with a six inch flange x mechanical-joint auxiliary gate valve meeting the requirements previously specified.

Gate valves shall be iron-body, bronze-mounted, double-disc, parallel-seal valves meeting the requirements of AWWA standard C500 for gate valves for ordinary water works service. All valves shall have nonrising stems and furnished with 'O-ring' packing. Valves shall be provided with a standard two inch square operating nut and shall open counter-clockwise. Valves shall be

equipped with mechanical-joint ends. Flange ends for hydrant auxiliary valves shall meet the requirements for ASA class 125 cast iron pipe flanges with bolt holes straddling center-lines."

In support of its position, the Town emphasizes Section III. N. 2(b)—which imposes the responsibility for construction on the developer—in conjunction with the absence of circumstances which would impose any financial burden on the Town under Section VIII. B. 1. of the ordinance. In response, the appellees assert that fire protection is the Town's responsibility under the statutes,[3] and that the Town failed to produce—at the summary judgment hearing—any plans, specifications, or a plat requiring the installation of the hydrants in question. Appellees reason, then, that the Town failed to show any financial obligation for fire hydrants arising from the ordinance.

It is not unusual for cities and towns to impose on developers of new additions the entire cost of on-site water systems—including facilities for domestic, commercial and fire-protection use. See, *Crowhill Homes, Inc. v. City of San Antonio*, Tex. Civ.App., 433 S.W.2d 448, 460–461, err. ref. n. r. e., 483 S.W.2d 35; *Blevens v. City of Manchester*, 103 N.H. 284, 170 A.2d 121, 122–123; and *Zastrow v. Village of Brown Deer*, 9 Wis.2d 100, 100 N.W.2d 359, 364. Such conditions precedent are usually considered to be a reasonable exercise of a town's police power. See, *Prudential Trust Co. v. City of Laramie*, Wyo., 492 P.2d 971, 974. In the instant case, there is no challenge to the Town's authority to impose such costs; rather there is only a question as to whether it has done so under this ordinance.

In deciding this question, we are primarily concerned with the ordinance provision that "The developer shall be responsible for . . . construction." The conclusion that such language imposes the financial obligation for all on-site water-system improvements is apparent when other ordinance provisions are considered. Section

---

**3.** Appellees cite §§ 15–1–502 and 15–1–510, W.S.1977 [§§ 15.1–55 and 15.1–63, W.S.1957, C.1965], both dealing with annexation of additional territory by cites and towns. We fail to see how either of these sections are determinant of anything relevant to this case.

III. K. 2(j)(2) provides that prior to final plat approval, the developer shall submit "a guarantee to the Town of the amount of the required physical improvements" in the form of cash, negotiable securities or other acceptable assurances. Section VIII. B. 1. indicates that the Town will share in the water-system expenses *if* unusually large sizes are required by the Town's long-range water-distribution plan. The last-mentioned provision discloses an intention to share expenses only under special circumstances. Appellees apparently recognized their general financial responsibility—short of paying for the hydrants and gate valves—since they admittedly paid for all other facets of the water and sewer system. Realizing that the ordinance provides minimum requirements as to the location and specifications for fire hydrants, and that prior to appellees' receipt of the hydrants they were merely "waiting to get the water mains hooked up to the fire hydrants" (Allison deposition, page 7), there is little doubt but that appellees were required to install the hydrants in question at particular, specified locations. While production of the plans, specifications, or the plat for the addition may have been helpful, it was not necessary to a construction of the minimum requirements of the ordinance. Nor is there evidence in the record which would indicate special circumstances, calling for the Town to pay a proportionate share of the costs of such physical improvements. In fact, the invoice attached as Exhibit 1 to the Sorrells deposition discloses that the fire hydrants and gate valves received and installed by appellees were the same size as required by Section VIII. B. 4. of the ordinance. No "unusually large sizes"—which would trigger the Section VIII. B. 1. cost-sharing provisions—are indicated.

We hold, therefore, that as a matter of law—arising from interpretation of the ordinance—appellees were, in this case, financially obligated to pay for the fire hydrants and valves ordered by the Town. While there are questions of fact surrounding the ordering of these items, they in no way affect the obligations imposed by the ordinance.

The summary judgment of the court below is reversed, and the case is remanded with directions to enter summary judgment in favor of the Town of Wheatland. We find no disputed facts as to the application of the ordinance which would require a full trial on this matter.

Reversed.

THOMAS, Justice, dissenting.

I agree that the judgment in this case properly is reversed, but I am compelled to dissent from the justification for that reversal set forth in the majority opinion. I challenge the constitutionality of an ordinance adopted under the police power which imposes a contractual obligation on a citizen such as Allison. Relying upon the police power for such a purpose extends the police power far beyond the justification for the power. See *Fuller Brush Co. v. Town of Green River*, 60 F.2d 613, 615 (D.Wyo. 1932).

It seems to me that if a contractual duty to pay can be structured under the police power then logically a contractual duty to buy could be imposed. It would follow that that duty could be expanded to one requiring the citizen to buy at whatever price the city chose to set. I do not believe that the other members of this Court could tolerate that result. To me it is unfortunate that in this decision the Court does not distinguish and separate the identity of the Town of Wheatland in its government role which justifies this ordinance from its identity as a municipal corporation in a proprietary role which in my view would limit it to the usual remedies and theories in enforcing its contracts.

I would reverse the case and require that the matter be tried to determine whether the Town of Wheatland is entitled to recover under an implied contract theory. I believe that probably it is, and the suggestion that this result might not be available because of a possible waiver of the require-

ments of the ordinance by the city official who approved the plat does not disturb me. The requirements of the ordinance could be waived only by the governing board by formal action, and it does not appear that this occurred. Consequently, I would expect that after a trial Allison would be found liable for the value of merchandise which he received, but the ordinance would be available only as some evidence of the intent of the parties.